IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **CITIZENS FOR TRUMP,** | ) | CASE NO.: 1:16-CV-1465 |
| **NORTHEAST OHIO COALITION** | ) | |
| **FOR THE HOMELESS, and** | ) | JUDGE JAMES S. GWIN |
| **ORGANIZE OHIO,** | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | **DEFENDANTS' MEMORANDUM IN** |
| **CITY OF CLEVELAND, et al.,** | ) | **SUPPORT OF MOTION TO DISMISS** |
| | ) | **AND IN OPPOSITION TO PLAINTIFFS'** |
| Defendants. | ) | **MOTION FOR PRELIMINARY** |
| | ) | **INJUNCTION AND TEMPORARY** |
| | ) | **RESTRAINING ORDER** |

Defendants, The City of Cleveland and Mayor Frank G. Jackson, in his official capacity[1], submit this brief in support of their motion to dismiss Plaintiffs' complaint and in opposition to Plaintiffs' motion for preliminary injunction and temporary restraining order.

## INTRODUCTION

The 2016 Republican National Convention ("RNC") will be held in Cleveland, Ohio at the Gateway Sports Complex[2] ("Event Complex") from July 18-21, 2016 ("Event Period"). The City has enacted temporary regulations ("Regulations")[3] that establish an official parade route and institute a permit process for parades, park use, and use of an official speakers platform provided by the City. The Regulations further define an Event Zone that designates portions of

---

[1] The City of Cleveland and Mayor Jackson referred hereinafter collectively as the "City" or "Defendants."
[2] The Gateway Sports Complex includes Quicken Loans Arena, where the business of the convention will take place, and Progressive Field, where supporting activities and delegate meetings will occur.
[3] Cleveland Board of Control Resolution No. 252-16, adopted May 25, 2016 ("Ex. 7").

the downtown Cleveland area, outside of any "Secure Zone,"[4] where the regulations have effect. The regulations ban certain items from the Event Zone that are deemed to present a risk to the safety and security of the public.  Apart from these restrictions, the Regulations do not otherwise restrict the public's freedom to exercise its First Amendment rights in any public place within the Event Zone.

Plaintiffs seek to have the Court order the City to alter the Regulations to redefine the geographic limits of the Event Zone, reduce the restrictions on certain items in the Event Zone, provide additional parks for assembly, alter the official parade route, allow alternative parade routes, and alter the times for and duration of permitted parades.  Plaintiffs' Complaint ("Pls.' Compl.") at 23.  Plaintiffs also seek to have the Court order the City to immediately process Plaintiffs' permit applications.  *Id.*  Plaintiffs further request declaratory judgment that: (1) Defendants' delay in issuing Plaintiffs' permits violates Plaintiffs' First Amendment rights; (2) the Regulations violate Plaintiffs' First Amendment rights; and (3) the Regulations violate Plaintiffs' due process rights.  *Id.*  Finally, Plaintiffs request damages and an award of interest, costs, and attorney fees.  *Id.* at 22–23.

The City has promulgated an official parade route and parade regulations that permit eighteen parades during the Event Period to approach within sight and sound of the Event Complex.  The City has promulgated park use regulations that require permits only for the installation of art and other structures.  The City has promulgated a registration process to use an official speaker's platform on Public Square.  Permits are not required for other park uses.  All areas within the Event Zone that are open to the public, including certain streets and areas bordering the Event Complex and closed to vehicular traffic, are available for peaceful, expressive activity.  The Regulations do not confine demonstrations, rallies, protests, or other

---

[4] "Secure Zone" is defined in the Regulations as "the area or areas in the Event Zone" to which access is restricted by the United States Secret Service or the Department of Public Safety.  Ex. 7 § II(a)(19).

-2-

protected speech to any limited, designated area.  The public will have ample opportunity for sight and sound contact with delegates arriving to and departing from the convention.  The ban on certain items within the Event Zone is a reasonable restriction rationally based on the unique security challenges present during the Event Period.  Finally, the City has processed Plaintiffs' permit applications and informed Plaintiffs thereof.

The Court should grant Defendants' motion to dismiss because the City has afforded Plaintiffs their rights under the First and Fourteenth Amendments, Plaintiffs cannot meet the standards required for issuance of a preliminary injunction, and Plaintiffs' claims related to the consideration of their permit applications are moot.

## FACTS

The City offers the following facts:

A.   **The City's Preparations for Hosting the RNC**

As a prominent event in American democracy, this event will draw worldwide attention. An estimated 50,000 official visitors will participate, including media, delegates, party officials, elected officials, candidates, and security personnel from local, state, and federal agencies.  The estimates of other expected visitors vary widely.

As part of the negotiations to host the RNC, the City committed to providing City-owned facilities to the Host Committee, including Public Hall, public areas of City Hall, Browns Stadium, Voinovich Park, Malls A, B, and C, and certain parking lots.  Cleveland Codified Ordinances No. 880-14 ("Ex. 6") § 1.

The Secretary of the United States Department of Homeland Security, pursuant to 18 U.S.C. § 3056(e), has designated the 2016 RNC as a "National Special Security Event" ("NSSE").  Declaration of Special Agent Ronald L. Rowe Jr. ("Ex. 2") ¶ 9.  This designation identifies the RNC as a potential target for terrorism and criminal activity.  Declaration of

Deputy Chief Edward Tomba ("Ex. 1") ¶ 33.  As such, federal law requires the United States

Secret Service ("Secret Service") to plan, coordinate, and implement security operations during

the 2016 RNC.  Ex. 2 ¶ 8.  The Secret Service serves as the lead federal agency to work with

other federal, state, and local law enforcement and public safety organizations to develop special

precautions and safety measures for the RNC.  Ex. 2 ¶ 10.  In protecting the RNC, the Secret

Service is authorized to create restricted zones, and federal law explicitly prohibits persons and

groups from entering a restricted area where a Secret Service protectee is or will be visiting or

where a NSSE is held.  Ex. 2 ¶ 11.  The Secret Service will be establishing restricted zones

around the Event Complex and the Huntington Convention Center of Cleveland at 300 Lakeside

Avenue ("Huntington Center") and coordinating a secure 24-hour shuttle between the two

locations ("Restricted Zones).  Ex. 2 ¶¶ 6, 12.  Only credentialed individuals will be permitted

access to the Restricted Zones.  Ex. 2 ¶¶ 11, 14.  The City is responsible for security outside of

the Restricted Zones.  Ex. 1 ¶ 23.  As part of the City's preparations for hosting the RNC, the

City of Cleveland Division of Police ("CPD") conferred with other federal, state, and local law

enforcement agencies, including the Secret Service, beginning shortly after the City was named

to host the RNC, to formulate a security plan.  Ex. 1. ¶ 7.  The security plan has been publicized

in stages for security and logistical reasons.  Ex. 1 ¶ 9; Declaration of Assistant Director of

Public Safety Edward J. Eckart Jr. ("Ex. 3") ¶ 15.

In developing the security plan, the Secret Service and the CPD had to consider and

balance many factors, including: (1) the potential for a wide array of  security threats; (2) the

security measures and strategies necessary to prevent any security threat; (3) the distance

necessary to minimize the effects of weapons, explosives, and biological or chemical agents if

deployed in or around the Restricted Zones; (3) the geography of the area surrounding the

Restricted Zones; (4) the space necessary to secure the Restricted Zones, including the ability to

ensure access by emergency vehicles and other necessary traffic; (5) the need to maintain public access and traffic flow within the Event Zone and between the Event Zone and the rest of Cleveland; (6) the need to maintain normal City services; (7) the need to allow adequate opportunities for First Amendment activities within the Event Zone; and (8) the need to protect people and property from civil unrest, disturbance, and violence.  Ex. 2 ¶¶ 13–17, 23; Ex. 1 ¶¶ 15–22.

B.    **The Restricted Zones**

As detailed in the Declaration of Special Agent Ronald L. Rowe Jr., although the Quicken Loans Arena is the venue for official RNC sessions, Progressive Field, which is directly adjacent to the Arena, is part of the Complex, and meetings, entertainment, and activities for delegates and other visitors are scheduled at Progressive Field throughout the RNC.  Ex. 2 ¶ 5.

Media covering the RNC will be working at the Huntington Center.  Ex. 2 ¶ 6.  Members of the media will be transported between the Complex and the Huntington Center via a 24-hour media shuttle.  *Id.*  This secure shuttle requires a dedicated route of transport (the "Press Chute"), which runs down portions of East 9th Street, St. Clair Avenue, and Lakeside Avenue.  *Id.*  The Press Chute will also be used by screened, authorized vehicles.  *Id.*

In an effort to allow pedestrians to approach the Event Complex, there is a "pedestrian only" area near the Event Complex.  Ex. 2 ¶ 15.  Vehicles will be kept further away to prevent vehicle-borne explosives from approaching.  *Id.*  Portions of Ontario Street and Carnegie Avenue will be closed to pedestrian and vehicular traffic.  Ex. 2 ¶ 18.  Around the Huntington Center, portions of St. Clair Avenue and Lakeside Avenue will be closed to vehicular traffic.  Ex. 2 ¶ 20.  As a result of the Press Chute, a portion of East 9th Street will be closed to vehicular traffic, other than the media shuttle and authorized vehicles.  Ex. 2 ¶ 21.  Vehicles traveling east and west

across East 9th Street will be able to cross at designated intersections staffed by law enforcement officers.  *Id.*

C.     **The Event Zone Permit Regulations**

On May 25, 2016, the City promulgated regulations that establish an official parade route, regulate park use, and establish and regulate use of an official speakers platform provided by the City.  Ex. 1 ¶ 10.  The Regulations also ban certain items from the Event Zone for security reasons.  Ex. 1 ¶ 12.  The regulations define the Event Zone and limit the Regulations' operative effect to the Event Zone.  Ex. 7 §§ II(a)(9), II(c), III(a), III(b).  The Regulations expire on their own terms at the conclusion of the RNC.[5]

1.     The Event Zone:  The Regulations define the Event Zone by map reference.  Ex. 7 § II(a)(9).  The Event Zone is generally bounded on the north by Lake Erie, on the west by West 25th St., on the south by Carnegie Ave. and Interstate 90, and on the east by Interstate 90 as it turns northward.  The City of Cleveland encompasses 77.7 square miles.[6]  Granting *en arguendo* that Plaintiffs accurately measured the Event Zone at 3.3 square miles, Pls.' Compl. ¶ 35, this represents approximately 4% percent of the City's landmass.  In addition, a portion of the Cuyahoga River winds through the Event Zone and large areas in the Event Zone are not open to the general public including Burke Lakefront Airport, the Port of Cleveland and the Restricted Zones.  No person will be denied access to the Event Zone.  Ex. 1 ¶ 50.  There will be delegates traveling in and around the Event Zone.  Ex. 1 ¶ 17.  Delegates will be lodging at hotels in and around the Event Zone and will travel to and from the Event Complex on foot.  *Id.*  All those interested will have the opportunity to be within sight and sound of the delegates as they traverse to and from the Event Complex.  *Id.*

---

[5] Section I(d) of the Regulations provide that the Regulations shall "terminate at 12:01 a.m. Eastern Daylight Time on July 24, 2016."  The Regulations provide for a limited extension of the effective date of the Regulations should the RNC be delayed.
[6] U.S. Census data 2014, *available at* http://www.census.gov/quickfacts/table/INC110214/3916000.

2.    Avenues for First Amendment Activity within the Event Zone:  The Regulations do not restrict First Amendment activities to designated areas.  *See* Ex. 7; Ex. 1 ¶ 38.  Apart from the restrictions on parades, certain park use, the use of an official speaker's platform, and certain prohibited items, the only other restrictions on expressive activity within the Event Zone are the same generally applicable laws that have been in force prior to the Event Period.  Ex. 1 ¶ 38.

Numerous areas around the Event Complex will provide the public prime sight and sound access to the delegates, members of the media, and other officials, including: (1) city sidewalks outside of the Event Complex that are open to the public; (2) Prospect Ave. which will be closed to vehicular traffic but open to pedestrian traffic and is within sight and sound of the Event Complex and intersects with the path of delegates arriving and departing the Event Complex on foot (*see* "Parade Route and Public Access" presentation ("Ex. 15") at 18, 19, 23, 24)[7]; (3) the sidewalk on the east side of East 9th St. and a section of Erie Court next to the Erie Street Cemetery that will be open to the public and is within sight and sound of the Event Complex (*id.* at 16, 17); (4) a large triangular area ("the Triangle") along the south side of Ontario St., next to the Lorain-Carnegie Bridge that is within sight and sound of the Event Complex and is large enough to accommodate several thousand people (*id.* at 11–15); (5) a portion of East Huron Rd. near East 7th St. that will be closed to vehicular traffic, but open to pedestrian traffic, and is within sight and sound of the Event Complex (*id.* at 21); and (6) a portion of East 4th St. south of Prospect Ave. that will be closed to vehicular traffic but open to pedestrian traffic and is within sight and sound of the Event Complex (*id.* at 20, 22).  These public viewing areas will be open to the public at all times during the RNC.

3.    The Official Parade Route:  The City undertook significant planning and considered alternate routes before deciding on the Official Parade Route.  Ex. 1 ¶¶ 18–32; Ex. 3

---

[7] The "Parade Route and Public Access" Power Point® was presented by Defendants' counsel to Plaintiffs' counsel on June 6, 2016 at the law offices of Jones Day.

¶¶ 35–37.  The logistical difficulties in coordinating even one parade route in the Event Zone necessitate the designation of a single parade route that both complies with the First Amendment and does not compromise the security needs for the convention and the City's other required services.  Ex. 1 ¶ 34–36.  CPD does not have the resources to effectively protect multiple parade routes during the RNC.  Ex. 1 ¶ 35.

During the Event Period, the Regulations displace, within the Event Zone, the City's standard parade regulations and allow permitted parades to travel only along the Official Parade Route.  Ex. 7 §§ I(c), II(d)(1).  The route begins on Carnegie Avenue 500 feet east of West 20th Street proceeds along the Lorain-Carnegie Bridge to the intersection of Ontario Street, turns right and proceeds along Ontario Street and terminates at the intersection of Orange Avenue and East 9th Street.  Ex. 7 § II(a)(10).  Parade participants may then egress on sidewalks along East 9th Street or East 14th Street and back toward the Event Complex.  *Id.*  At its closest point, the Official Parade Route comes within approximately 160 feet of the Event Complex[8].  The Official Parade Route is within view of the Event Complex and allows extensive media coverage due to its exposure along the Lorain-Carnegie Bridge.  *See* Ex. 1 ¶ 39.

The streets comprising the Official Parade Route and its starting point will be closed to vehicular traffic during the Event Period.  Ex. 1 ¶ 37.  The City considered the following alternate parade routes, yet they either fall within the Restricted Zones or need to remain open for vehicular traffic to maintain traffic flow and necessary city services:

a.    <u>Superior Avenue</u>:  Due to the closure of the Lorain-Carnegie Bridge by the Secret Service, and the impediments on Lakeside Avenue near the Huntington Center, significant bus and commuter traffic must be rerouted across the Detroit Superior Bridge.  Ex. 1 ¶ 28.  Superior Avenue is essential for maintaining east-west bus routes.  *Id.*  As stated in the

---

[8] This measurement was taken uses Google Maps® distance measuring function.  *See* Ex. 15 at 26, 28.

Declaration of Joel B. Freilich, the Greater Cleveland Regional Transit Authority ("RTA") needs Superior Avenue to remain open for the orderly flow of RTA traffic across the Cleveland area. Declaration of Joel B. Freilich ("Ex. 4") ¶ 9.  Superior Avenue is the "main linkage" between the east side and the west side bus service during the RNC.  *Id.*  For purposes of RTA's transportation operations, the "most critical" segment of Superior Avenue is the segment stretching from West 25th Street to East 30th Street.  *Id.*  Superior Avenue is also critical for maintaining the western emergency route out of downtown to Metro Health Center, Cuyahoga County's largest level 1 trauma center.  Ex. 1 ¶27; Ex. 3 ¶ 41.

   b. <u>Carnegie Avenue</u>:  Portions of Carnegie Avenue near the Event Complex will be closed to vehicular and pedestrian traffic.  Ex. 2 ¶ 19.  Carnegie Avenue to the east of the event Complex must be kept open at all times because it serves as the eastern emergency route out of downtown to the Cleveland Clinic and University Hospital.  Ex. 1 ¶ 25; Ex. 3 ¶ 38. University Hospital is one of only two level 1 trauma centers in Cuyahoga County.  Ex. 1 ¶25; Ex. 4 ¶ 39.

   c. <u>Ontario Street</u>:  Portions of Ontario Street will be closed to pedestrian and vehicular traffic near the Event Complex.  Ex. 2 ¶ 19; Ex. 1 ¶ 32.

   d. <u>Prospect Avenue</u>:  Portions of Prospect Avenue will be closed to vehicular traffic.  Ex. 1 ¶ 26.  The installation of security barriers will narrow the street.  *Id.*  Limiting Prospect Avenue to pedestrian traffic will enable the public to be near the Event Complex, have access to the delegates, and allow other First Amendment activity.  *Id.*; Ex. 3 ¶ 39.

   e. <u>Euclid Avenue</u>:  Euclid Avenue is a "heavily used" bus route through use of RTA's HealthLine.  Ex. 4. ¶ 10.  The only street that runs parallel to Euclid Avenue in the Event Zone will be closed in part to vehicular traffic.  *Id.*  If Euclid Avenue is closed, no other parallel route could handle the increased bus traffic.  Ex. 1 ¶ 27; Ex. 4 ¶ 10.  Euclid Avenue is

also a primary route for the City's emergency evacuation plan.  Ex. 1 ¶ 27.  Euclid Avenue is one

of the primary routes for pediatric EMS transports to Rainbow Babies and Children's Hospital.

Ex. 3 ¶ 40.

        f.    <u>East 9th Street</u>:  A portion of East 9th Street will be closed to vehicular

traffic to accommodate the Press Chute, which is an integral part of the Secret Service's

transportation plan and must remain open continuously.  Ex. 2 ¶ 21.

        g.    <u>Lakeside Avenue and St. Clair Avenue</u>:  Portions of Lakeside Avenue and

St. Clair Avenue will be closed to vehicular and pedestrian traffic as a result of the Restricted

Zone near the Huntington Center.  Ex. 2 ¶ 20; Ex. 1 ¶¶ 29, 30.  Lakeside Avenue will also serve

as the staging area for significant emergency response assets, including fire and EMS.  Ex. 1 ¶

30; Ex. 3 ¶ 43.

        4.    <u>Parade Regulations</u>:  The Regulations permit up to eighteen parades during the

Convention Period: three on Monday, July 18, 2016 and five each day from Tuesday, July 19

through Thursday, July 21, 2016.  See Ex. 7 § II(e)(1).  Each parade permit will cover a one-hour

time period, requiring the parade to commence within ten minutes of its assigned start time.  Ex.

7 § II(f).  If fewer than eighteen applicants receive parade permits, the City committed to the

ACLU to work with applicants who desire a longer parade period.[9]

Due to the close proximity of the Official Parade Route to the Event Complex, the Secret

Service will not allow vehicles on the route as portions lie within the pedestrian only zone.  Ex. 2

¶ 15.

Portable, hand-held sound amplification equipment is permitted on the Official Parade

Route.  Ex. 7 §§ II(a)(21), II(f)(7).

---

[9] *See* Letter from the City to Ms. Freda Levenson (June 10, 2016) (attached as Exhibit 16).

5.    <u>Park Use Regulations</u>:  The Regulations require a park use permit only for placing Public Art[10] or a Public installation[11] in one of two City parks.  Ex. 7 § II(d)(2).  The Regulations do not require or authorize the issuance of permits for other uses.  See Ex. 7 § II(d).  The Regulations restrict advertising, commercial activity, fires, property damage, camping, the use of Sound Amplification Equipment[12], and vehicles in City parks.  Ex. 7 § II(g).  All other expressive activity is permitted on a first-come, first-served basis.  Plaintiffs correctly state that "no park or space may be reserved" to the exclusion of others.

Permits for park use are available from Monday, July 18 through Thursday, July 21, 2016 between 9:00 a.m. and 9:00 p.m. each day.  Ex. 7 § II(e)(2).

6.    <u>Prohibited Items</u>:  The Regulations prohibit certain items within the Event Zone.  Ex. 7 § III.  All of the prohibited items are known to CPD as having been used to cause injury or to facilitate criminal activity at other security events or are otherwise prohibited by generally applicable laws that have been in effect prior to the Event Period.  Ex. 1 ¶12; Ex. 3 ¶ 18.

The Regulations on prohibited items do not apply to residents in their place of residence.  Ex. 7 § III(c)(2).  The homeless population within the Event Zone is small[13] and well known to CPD.  Ex. 1 ¶ 53.  For purposes of the enforcement of the Regulations, the City considers these particular homeless people to be residents of the City.

7.    <u>Official Speakers Platform Regulations</u>:  The Regulations require the City to provide an Official Speakers Platform with sound amplification equipment.  Ex. 7 § II(h)(4).

---

[10] "Public Art" is defined in the Regulations as "the placement of art or other object containing public messaging on any Public Grounds with the intention to leave it for a period of time to be viewed by the public."  Ex. 7 § II(a)(18).
[11] "Public Installation" is defined in the Regulations as "the placement of any structure or physical object which hinders the free use and passage of pedestrians on Public Grounds, including tables, chairs, temporary structures and canopies."  Ex. 7 § II(a)(17).
[12] "Sound Amplification Equipment" is defined in the Regulations as "any system or piece of equipment used for the production of amplified sound, *excluding* megaphones, bullhorns and portable battery-operated sound amplification devices."  Ex. 7 § II(a)(21) (emphasis added).
[13] The City does not dispute Plaintiffs' estimate that the homeless population within the Event Zone numbers between 90 and 110.  Pls.' Compl. ¶ 57.

The Official Speakers Platform will be located in Public Square.  Ex. 7 § II(a)(11).  Persons may use the Official Speakers Platform on a first-come, first-served basis limited to thirty-minute increments between 9:30 a.m. and 6:00 p.m. each day from Monday, July 18 through Thursday, July 21, 2016.  Ex. 7 § II(h).  No person may use a speakers platform[14], other than the Official Speakers Platform, within the Event Zone.  Ex. 7 § II(c).

       8.     <u>The Permitting Process:</u>  When drafting the Regulations, the City anticipated a large number of requests for permits during the Event Period yet could not know the actual number of applications it would receive.  Declaration of Danielle Graham ("Ex. 5") ¶ 10.  For this reason, the City could not arbitrarily commit to a precise time period within which to decide upon every permit application.

       Plaintiff, Citizens for Trump, filed an initial application ("Ex. 9")[15] on or about April 25, 2016.  Ex. 5 ¶ 26; Ex. 9 at 3.  On April 26, 2016, the City responded to Mr. Selaty, a representative for Citizens for Trump, and notified him that his application would be kept in the order it was received and that decisions would be made after final approval of the security plan.  Ex. 9 at 2.  On May 31, 2016, the City contacted Mr. Selaty and asked him to resubmit his request using the new permit application.  Ex. 5 ¶ 27.  On June 1, 2016, Mr. Selaty submitted another permit application ("Ex. 11")[16] requesting to conduct a six hour parade along East 9th St., to reserve an entire park for multiple days, and to install a "full stage" complete with sound amplification equipment.  Ex. 5 ¶ 29; Ex. 11.  On June 16, 2016, the City issued Citizens for Trump a parade permit for the Official Parade Route.  Ex. 5 ¶ 30; Ex. 12.  On June 20, 2016, the City denied Citizens for Trump's request to use a park for a rally, erect a stage, and install a sound system.  Ex. 5 ¶ 32; Ex. 14.

---

[14] "Speakers Platform" is defined in the Regulations as "the placement and use of a podium, platform, pedestal, stand or similar object to make a public speech, other than the Official Speakers Platform."  Ex. 7 § II(a)(22).
[15] Exhibit 9 includes email correspondence between Plaintiff, Citizens for Trump, and the City.
[16] Exhibit 11 includes email correspondence between Plaintiff, Citizens for Trump, and the City.

On or about March 16, 2016, the City received a permit application ("Ex. 8") from Plaintiff, Organize Ohio, represented by Ms. Dothey and Mr. Bresler.  Ex. 5 ¶ 25.  The application was acknowledged on March 16, 2016 and April 26, 2016.  Ex. 5 ¶ 25.  On May 31, 2016, the City contacted Organize Ohio and asked the organization to resubmit its request using the new permit application.  Ex. 5 ¶ 27.  On June 1, 2016, Mr. Bresler submitted a new application ("Ex. 10") requesting a parade route other than the Official Parade Route.  Ex. 5 ¶ 28. On June 20, 2016, Organize Ohio's permit application was denied because it did not request the Official Parade Route.  Ex. 5 ¶ 31; Letter from the City to Ms. Dothey and Mr. Bresler ("Ex. 13") (denying permit application).

As of June 20, 2016, the City has issued 51 permits under the Regulations.  Ex. 5 ¶¶ 21–23.  The City continues to process permit applications as they are received.  Ex. 5 ¶ 24.

The Regulations provide for an appeal process that requires the Director of Public Safety ("Director") or the Director's designee to hold a hearing on the denial or revocation of a permit within three business days of receipt of a notice of appeal.  Ex. 7 § II(s).  If the Director affirms the denial or revocation, the applicant shall be notified immediately.  *Id.*

## **ARGUMENT**

The Court should grant Defendants' motion to dismiss Plaintiffs' complaint and deny Plaintiffs' motion for injunctive relief and temporary restraining order.  The City has not violated Plaintiffs' constitutional rights; thus, Plaintiffs' complaint does not present a plausible claim. Dismissal is therefore appropriate.  Additionally, injunctive relief is unavailable because the City's actions are constitutional, and it is therefore unlikely that Plaintiffs will be successful on the merits.

A.      **Governing Legal Standards**

1.      Rule 12 Dismissal:  "A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is designed to test the sufficiency of the complaint."  *Riverview Health Inst. LLC v. Med. Mut.*, 601 F.3d 505, 512 (6th Cir. 2010). A plaintiff's complaint must be dismissed under Rule 12(b)(6) unless the complaint demonstrates a plausible cause of action.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  To present a plausible claim, plaintiffs must raise "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 555 (2007).  If the complaint fails to demonstrate a plausible claim for relief "or if the face of the complaint demonstrates that relief is barred by an affirmative defense," dismissal is appropriate.  *Cheatom v. Quicken Loans.*, 587 Fed. Appx. 276, 279 (6th Cir. 2014) (citing *Riverview Health Inst. LLC*, 601 F.3d at 512).

2.      Requests for Injunctive Relief:  In determining whether to grant a preliminary injunction, courts consider four factors: (1) whether the plaintiff demonstrated "a strong or substantial likelihood of success on the merits;" (2) whether the plaintiff demonstrated an irreparable injury; (3) whether the "preliminary injunction would cause substantial harm to others;" and (4) "[w]hether the public interest would be served by issuing a preliminary injunction." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). "A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue." *Anderson v. Kelly*, No. 92-6663, 1993 WL 524235, at *4 (6th Cir. Dec. 15, 1993).  No one factor is dispositive in this inquiry. *Id.*

B.     **As an Initial Matter, the City's Restrictions are Less Burdensome than Other Convention Cities' Restrictions that were Constitutionally Permissible.**

1.     New York City, NY:  2004 Republican National Convention:  New York City designated a demonstration zone, a "frozen zone" barring all pedestrian traffic, and a no-demonstration zone banning protesting, leafleting, or congregating.  *Marcavage v. City of New York*, 689 F.3d 98, 101–02 (2d Cir. 2012).  Plaintiffs' primary argument was that the demonstration zone was not within sight and sound of the convention center.  *Id.* at 108.  The Second Circuit, nevertheless, held that "[t]he no-demonstration zone does not burden *substantially* more speech than necessary, even if alternatives are conceivable."  *Id.* at 106 (emphasis in original).  The Second Circuit found the restrictions narrowly tailored to achieve a significant government interest, explaining:

> The police had to design measures to cope with a security challenge that was altogether extraordinary….Fifty thousand attendees were expected for the Convention itself.  Protesters of different persuasions would descend.  Vehicle and pedestrian traffic would be rerouted along two main arteries….These facts, taken together, bespeak a significant—indeed, compelling—government interest in security.

*Id.* at 105.

2.     Denver, CO:  2008 Democratic National Convention:  In *Am. Civil Liberties Union v. City of Denver*, 569 F. Supp. 2d 1142, 1189 (D. Colo. 2008), the demonstration zone was located in a portion of the immense parking lot that surrounded the convention center.  *See id.* at 1153.  The view of the convention center from the zone was partially obstructed, and although delegates could conceivably come within eight feet of the people within the demonstration zone, the bus stop for delegates was 200 feet away and did not require them to come any closer.  *See id.* at 1154.  The Denver official parade route allowed up to twenty parades during the convention: up to five per day from 11:00 a.m. to 2:30 p.m.—less than an hour per parade.  *See id.* at 1156.  The closest the parade route came to the convention center, during the

convention, was 1800 feet and only a "sliver" of the convention center was visible.  *Id.* at 1158–59; Ex. 15 at 27, 28.

        3.      <u>Saint Paul, MN:  2008 Republican National Convention:</u>  In *The Coalition to March on the RNC & Stop the War v. City of St. Paul*, 557 F. Supp. 2d 1014, 1030 (D. Minn. 2008), plaintiffs challenged a parade route that, although passing within eighty feet of the convention center at one point, was not within sight or sound of the main entrance to the center and was scheduled before delegates were likely to arrive.  St. Paul also established a designated public viewing area mostly within sight and sound of the convention center.  *Id.* at 1029.  The court upheld the restrictions, noting that "there is no obligation on the part of the St. Paul Police Department or the other defendants to maximize the opportunities for physical confrontation with conventioneers."  *Id.* at 1031.

        4.      <u>Boston, MA:  2004 Democratic National Convention:</u>  In *Coalition to Protest the Democratic Natl. Convention v. City of Boston*, 327 F. Supp. 2d 61, 78 (D. Mass. 2004), the designated free speech zone was "an offense to the spirit of the First Amendment," *id.* at 76, and the designated parade route had "some elements of adequacy," *id.* at 72.  The court further found that "while the practical differences between the contested parade routes may be small, the symbolic differences loom larger."  *Id.*  The closest the Boston parade route came to the convention center was approximately 780 feet, and the view was restricted down narrow streets.  *See id.* at 76; Ex. 15 at 35, 36.  The closest the public could get to the convention center was a block away at the designated free speech zone the court described as "an internment camp."  327 F. Supp. 2d at 74.  The court, however, found the designated zone and parade route constitutional, during the convention period, because "there is no injunctive relief that [the court] could fashion that would vindicate plaintiffs' First Amendment rights without causing quite significant harm to the City, the delegates, and the public interest…in the form of increased risk

to those attending the DNC and further strain on the overtaxed manpower resources of public safety personnel." *Id.* at 76.  Adequate alternate avenues of communication were present because Boston "provided nuanced, reticulated options for many different types of expression within the soft zone." *Id.* at 71–72.

5.    Charlotte, NC:  2012 Democratic National Convention:  The City of Charlotte established an official parade route that did not come within sight or sound or within 950 feet of the main convention center.  Ex. 15 at 45–47.  Charlotte's parade route was not challenged.

6.    Tampa, FL:  2012 Republican National Convention:  The City of Tampa established an official parade route that came within 860 feet of the convention center at its closest point.  Ex. 15 at 26, 41, 42.  Tampa also designated a protest zone that was approximately 270 feet from the convention center.  Ex. 15 at 26, 43.  Tampa's restrictions were not challenged.

C.    **The City's Parade, Speech, and Assembly Restrictions are Constitutionally Permissible.**

1.    Free-speech claims require a three-step inquiry:  first, the court must determine "whether the speech at issue is afforded constitutional protection;" second, the court looks to the "nature of the forum;" and third, the court looks to "whether the government's action in shutting off the speech was legitimate in light of the applicable standard of review." *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015) (en banc).  The City does not dispute that Plaintiffs' anticipated activities constitute protected speech, or that they will take place in traditionally public fora.  Accordingly, the relevant issue for this Court's consideration is whether the Regulations are legitimate.  Under this test, the City may impose reasonable restrictions on the time, place, and manner of protected speech if the restrictions are justified without regard to the content of the speech, are narrowly tailored to serve a significant government interest, and there are ample alternative channels for communication of the desired

-17-

message. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Note that although Plaintiffs bring claims under both Ohio law and the U.S. Constitution, "the free speech guarantees accorded by the Ohio Constitution are no broader than the First Amendment." *Eastwood Mall, Inc. v. Slanco*, 626 N.E. 2d 59, 61 (Ohio 1994).

      2.    <u>The restrictions are justified without regard to the content of Plaintiffs' speech.</u>

Plaintiffs do not allege that the restrictions are content based. *See* Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction and Temporary Restraining Order ("Pls.' Memo.") at 2–3. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791.

      3.    <u>The restrictions are narrowly tailored to serve a significant government interest.</u>

Courts agree that maintaining the physical security of persons and property involved in a high-profile event, like a political convention, is a government interest of "the highest order." *Citizens for Peace*, 477 F.3d 1212 (10th Cir. 2007). Plaintiffs do not disagree that ensuring the public's safety is a significant government interest, as "political conventions are potential terrorist targets." *Marcavage*, 689 F.3d at 101.

The Regulations are narrowly tailored because the public would be less secure absent the Regulations. For a restriction to be narrowly tailored, it "need not be the least speech-restrictive means of advancing the Government's interests." *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 662 (1994). "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (quotation omitted). The Regulations compare favorably with constitutionally sound regulations other cities have enacted during recent political conventions: the City has not designated any areas as "no demonstration" zones; the Official Parade Route

-18-

comes within sight and sound of the Event Complex; and the Regulations provide for as many as eighteen, one hour long parades.  Finally, the Regulations are limited to a small portion of Cleveland and will expire at the conclusion of the RNC.

4.  <u>There are ample alternative avenues of communication.</u>

"[T]he 'ample alternatives' element is a multi-factor, fact-intensive inquiry.  While it must give some deference to the speaker's desire to reach a particular audience or speak at a particular place, it does not require that the speaker have the ability to engage in precisely the same means of expression in precisely the same location, nor does it require that the speaker have the ability to communicate in the same manner as he or she wishes."  *ACLU v. Denver*, 569 F. Supp. 2d at 1164 (collecting cases).  Indeed, the alternatives may be adequate even if they "do not necessarily permit the same quantity of speech, prohibit the preferred method of communication, or reduce the size of the potential audience."  *Id.*

Plaintiffs are not entitled to choose the alternative channel that they desire.  *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) ("It is also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired.").  Indeed, the First Amendment "does not guarantee [protesters] access to every or even the best channels or locations for their expression."  *Carew-Reid v. Metro Transp. Auth.*, 903 F.2d 914, 919 (2d Cir. 1990).  "All that is required is that an alternative channel be ample—i.e., an 'adequate' channel for communication."  *Marcavage*, 689 F.3d at 107.  The City's resources, in terms of geography, logistics, and police coverage, are finite and will be severely burdened during the RNC.  Plaintiffs' desires to conduct hours-long parades on the routes of their choosing and to monopolize parks, if granted a permit to do so, would shift the City's resources in such a way to limit the channels of communication available to the rest of the public.

-19-

The essence of Plaintiffs' complaint is that the Regulations offend the First Amendment because they do not allow Plaintiffs to exercise their rights in precisely the manner they wish and to the exclusion of others.  Pls.' Memo. at 9.  Plaintiffs seem to prefer more regulation, so long as it allows them to monopolize a park and take limited parade time for themselves.  *See id.*

Even if Plaintiffs are unable to express themselves precisely as they would like, that does not mean that the alternatives are impermissible.  *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1226 (10th Cir. 2007) ("In this case, protesting on the periphery of the security zone allowed the Citizens to present their views to the conference delegates and international media.  They were not wholly cut off from their intended audience, such that there were no ample alternatives to a protest within the security zone itself.").  Numerous areas nearly surrounding the Event Complex are open to public and are within sight and sound of the delegates.  The City is providing an Official Speakers Platform and allowing the use of bullhorns and megaphones throughout the Event Zone.  These alternate avenues are adequate.

D.     **The City's Event Zone and Its Attendant Regulations are Constitutionally Permissible.**

In considering due process claims, this Court considers first "whether the interest at stake is within the Fourteenth Amendment's protection of liberty and property," and if so, then considers "the form and nature of the process that is due."  *Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002).  Because Plaintiffs failed to allege a deprivation of a liberty interest within the scope of the Fourteenth Amendment[17], the Court must therefore analyze the Event Zone and its attendant regulations under rational basis review.  "If legislation neither burdens a fundamental constitutional right nor targets a suspect classification, it will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate government interest."  *Ullmo v. Ohio Tpk.*

---

[17] Plaintiffs' mistake is understandable given that they were likely unaware that the City considers its homeless population to be residents and their places of abode to be residences under the Regulations.

*& Infrastructure Comm'n*, 126 F. Supp. 3d 910, 919 (N.D. Ohio 2015) (citation omitted). "A

state action 'will be considered constitutional under rational-basis review if there is any

conceivable state of facts that could provide a rational basis for it.'" *Id.* (quoting *Doe v. Mich.*

*Dept. of State Police*, 490 F.3d 491, 502 (6th Cir. 2007)). "The federal courts must accord great

deference to state legislative classifications created for legitimate social or economic purposes."

*37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 622 (6th Cir. 1997) (applying

rational basis review to a ban, for safety reasons, on certain sales).

      The boundaries of the Event Zone were chosen because they are easily identifiable major

streets or highways—to provide the public notice of where the boundaries are—and to

encompass all the sites critical to the security and logistical requirements of hosting the RNC.

Ex. 1 ¶ 42, 43, 47–49. The geographic extent of the Event Zone is rationally related to those

legitimate interests. The Plaintiffs' proposed zone does not encompass these sites. See

Plaintiffs' Proposed Order Granting Preliminary Injunction ("Pls.' Order") App. A. Further,

Plaintiffs' proposed zone, at one point, runs directly along the section of Ontario Street that abuts

the south side of the Event Complex, thus negating the purpose of having an Event Zone—to

provide a secondary level of security around the Secure Zone. *Id.*; Ex. 2 ¶¶ 13, 14.

      The temporary restriction on prohibited items is rationally related to the City's need to

ensure public safety during the unique conditions inherent in hosting a national political

convention. The City is banning those items within the Event Zone and during the Event Period

only because CPD identified those items as having been used at other security events to threaten

public safety. Public safety is a compelling interest, and the prohibited items restrictions are

reasonably related to advancing that interest and deserve the Court's deference.

E.     **Plaintiffs' Claim that the City is Impermissibly Delaying the Permitting Process is Incorrect and Moot**.

Before May 25, 2016, the City could not review Plaintiffs' permit applications, or any applications, because joint security, transportation, public safety planning was ongoing.  The City also did not know which parks would be available.  The City began reviewing applications promptly after the Regulations were promulgated.  The City contacted Plaintiffs and other applicants that had submitted applications prior to the enactment of the Regulations and allowed those earlier applicants to resubmit applications in accordance with the Regulations without losing their priority date of application.  Any delay was reasonable under the circumstances.

As of filing, Plaintiffs have received notice of their respective permit application status. The Regulations provide an appeal process that requires the Director to respond with a hearing within three days of notice of appeal.  Because Plaintiffs' permit applications have been processed and because sufficient time remains for appeal, Plaintiffs' claim regarding the delay is moot. In the Sixth Circuit, "[t]he test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties."  *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 550 (6th Cir. 2003) (citation omitted).  Here, Plaintiffs have already received their permit application decisions, and therefore, any relief that this Court grants will make no difference to the legal interests of the parties.  Plaintiffs' claim regarding the alleged delay in permit approvals is therefore moot.

F.     **Plaintiffs are not Entitled to Damages.**

Plaintiffs are not entitled to damages, particularly because they have not alleged that the City violated any clearly established law so as to overcome qualified immunity.  In determining whether a government official is entitled to qualified immunity, the Court must determine "whether 'a constitutional right would have been violated on the facts alleged' and, if so,

whether the right was 'clearly established.'" *Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001)).  The Sixth Circuit has held that "a defendant will only be held liable if his or her actions were objectively unreasonable in view of clearly established law." *Robertson v. Lucas*, 753 F.3d 606, 615 n.4 (6th Cir. 2014). The City has determined that certain restrictions are necessary in order to ensure the safety of the attendees of the convention and the public.  Imposing certain restrictions within a specified area is not "objectively unreasonable in view of clearly established law." *See Occupy Nashville*, 769 F.3d at 436, 445–47 (holding that no clearly established law was violated where state officials implemented a curfew for a park that had been being used for twenty-four hour demonstrations). As Plaintiffs have failed to show that the City violated any clearly established law, the City is entitled to qualified immunity, and Plaintiffs may not recover damages.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' complaint should be dismissed in its entirety.  The City's restrictions on the First Amendment are constitutionally permissible, in that they are content neutral, narrowly tailored to further a significant government interest, and provide for ample alternative avenues for communication.  The size of the Event Zone and the prohibition on certain items within the Event Zone are rationally related to a legitimate government interest.

Further, Plaintiffs cannot demonstrate likelihood of success on the merits of their cliam, thus requiring denial of their request for preliminary injunction.

Respectfully submitted,

BARBARA A. LANGHENRY (0038838)
Director of Law, City of Cleveland

By:  */s/ Stewart Hastings*
GARY S. SINGLETARY (0037329)
Chief Counsel
THOMAS J. KAISER (0014339)
Chief Trial Counsel
L. STEWART HASTINGS JR. (0025852)
Assistant Director of Law
City of Cleveland, Department of Law
601 Lakeside Avenue, Room 106
Cleveland, Ohio  44114-1077
Tel: (216) 664-2800  Fax: (216) 664-2663
E-mail: LSHastings@city.cleveland.oh.us
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

 */s/ Stewart Hastings*
*Counsel for Defendants*